**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

|  |  |
|---|---|
| TRAVCO INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 2:10-cv-14 |
| | ) |
| LARRY WARD, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S REBUTTAL BRIEF IN FURTHER
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant Larry Ward would have this Court conclude that: (1) drywall that he admits is in "pristine condition" has suffered a "direct physical loss"; (2) the same drywall that Ward's expert says produces sulfuric gases leading to widespread corrosion of metals does not have a "latent defect," nor is it "faulty, inadequate or defective"; (3) the widespread corrosion of metals in Ward's home is not a "loss caused by . . . corrosion"; (4) the sulfuric gases that he claims have caused widespread damage to metals and also caused him and his sons to suffer skin rashes, lesions, and nose bleeds, are not "gaseous . . . irritants or contaminants"; and (5) even though the property insurance coverage at issue only covers his home and personal property and not the land or the atmosphere, the pollution exclusion in the policy applies only to pollution of the outdoor environment.  All of these arguments defy common sense and find no support in Virginia law.

When the words used in the insurance policy are given their ordinary meaning, as Virginia law requires, there was no "direct physical loss" to the drywall, the composition of the drywall causing the production of sulfuric gases is a "latent defect" (and also makes it "faulty, inadequate or defective"), the sulfuric gases are "contaminants" and "irritants," and the damage

1

to the metals was "caused by . . . corrosion."  In Ward's own sworn answers to interrogatories in his state court suit against the suppliers and installers of the drywall, which he signed *after* TravCo denied his claim and filed this declaratory judgment action, *he* uses the word "defective" repeatedly to describe the drywall, uses the word "toxic" to describe the gases, and states that the metal items "have corroded."  (Doc. 17-10, at 3-4, 9-10.)  Ward's homeowners policy simply does not cover this loss.

## II.    ARGUMENT

### A.    The Undisputed Facts Material To This Motion Are Straightforward

This case involves straightforward issues of insurance policy interpretation that are appropriate for resolution by summary judgment.  The facts that are needed to apply the policy language are set forth in affidavits of Ward, his expert, and his expert's assistant, as follows:

1) The drywall "is physically intact, functional and has no visible damage," and "is in pristine condition."  (Doc. 31, at 3, ¶ 5; *see also* Doc. 31-1, ¶ 5; Doc. 31-5, ¶ 8.)

2) Ward's expert affidavit states that "[t]he corrosion of metal [in Ward's home] . . . results from exposure to reduced sulfur gases being emitted from the Chinese drywall and interacting with the metal."  (Doc. 31-1, ¶ 9; *see also* Doc. 17-10, at 3-4 (Ward's sworn answers to interrogatories).)  Ward's expert found that this corrosion is "widespread." (Answer, ¶ 22, admitting Complaint, ¶ 22.)

3) According to Ward, the sulfuric gases produce a "sulfuric odor [that] permeates the entire residence." (Ward Answer, ¶ 19, admitting Complaint, ¶ 19; *see also* Doc. 17-6, ¶ 3 (affidavit of Ward's inspector).)

4) According to Ward, the sulfuric gases are "toxic" and caused him and his family members to sustain "skin rashes," "[l]esions or warts on hands," "[s]inus congestion,"

and "[n]ose bleeds," all of which "resolved after moving out of the home."   (Ward

Answers to Interrogatories under oath, Doc. 17-10, at 3-5.)

These foregoing undisputed facts, all of which are taken from <u>Ward's own submissions</u>, are all

that is necessary to apply the relevant Policy provisions.

**B.      There Is No Coverage For The Claimed Losses To The Dwelling**

When the Policy provisions are applied to the undisputed facts set forth above, it is clear

that, as a matter of law, there is no coverage for the losses being claimed.  There is no "direct

physical loss" to the drywall, and four separate exclusions unambiguously apply to the remaining

claimed damage (and to the drywall if it were found to have sustained a "direct physical loss").

**1.      The Drywall Has Not Sustained A "Direct Physical Loss"**

As Ward's brief admits, the drywall "has no visible damage" and "is in pristine

condition." (Doc. 31, at 3, ¶ 5.)  Ward's own affidavit says that the drywall "maintains the same

physical appearance as it did when placed in the residence." (Doc. 31-5, ¶ 8.)  Ward's argument

that the drywall has sustained "direct physical loss" ignores the plain meaning of the phrase

"direct physical loss," defies common sense and is contrary to case law.

First, Ward argues that he has suffered a "loss of use" of his home which should

constitute a "direct physical loss" to the drywall covered under the Policy.  This argument,

however, is inconsistent with a plain reading of the Policy as a whole.  In an extension of

coverage entitled "Coverage D - Loss of Use," the Policy provides for payment of "Additional

Living Expense" (and "Fair Rental Value" for rental property) "if a loss covered under Section I

of the Policy makes that part of the 'residence premises' where you reside not fit to live in . . . ."

(Doc. 17-2, at 22.)  But in order for a loss to be "covered under Section I," there must be a

"direct physical loss to property." (*Id.* at 26.)  Thus, Ward's reasoning is circular.  If Ward were

correct that where a home becomes uninhabitable, there has been "direct physical loss to

property," the words "loss covered under Section I" in the "Loss of Use" section would become meaningless. The Policy plainly contemplates that loss of use coverage applies only if there is a covered *physical* loss to property.[1]

The cases Ward cites on this issue are inapposite. *U.S. Airways, Inc. v. Commonwealth Ins. Co.*, 2004 WL 1094684 (Va. Cir. Ct. May 14, 2004) involved a provision in a commercial property policy that provided coverage for loss of business income if such loss was caused by a denial of access to property by order of a civil or military authority. The issue was whether that coverage provision required that the order of civil authority result from physical damage to the *insured* property. The court held that "nothing in the Policy . . . requires that the catalyst for any civil or military intervention be damage to [the insured's] property." *Id.* at *5. Ward's Policy similarly contains a civil authority provision providing coverage for loss of use of the home "as a result of direct physical damage *to neighboring premises* caused by a Peril Insured Against under this policy" (Doc. 17-2 at 22 (emphasis added)), but that coverage, like the *U.S. Airways* decision, is irrelevant here.

Ward also cites *Sentinel Mgmt. Co. v. Aetna Cas. & Sur. Co.*, 563 N.W.2d 296 (Minn. Ct. App. 1997) and *Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002), which involved the release of asbestos fibers from building materials. As those courts explained, when "an asbestos product reaches the friability stage, it may be *crumbled* by vibrations or hand pressure and it *continues to deteriorate and separate* into fibers." *Id.* at 230

---

[1] Ward's reference to the definition of "Property Damage" in the Policy, which is defined to include "loss of use of tangible property" (Doc. 17-2, at 20), also supports TravCo's position. The specially defined term "Property Damage" is only used in *Section II* of the Policy, which provides *liability* insurance coverage for certain types of claims and suits brought by third parties against the insured. (*See id.* at 33-37.) The defined term "Property Damage" is not used in *Section I* of the Policy, which provides the first-party property coverage at issue here. The distinction the policy makes between "direct physical loss" (the terminology used for first-party property coverage) and "Property Damage" (a term used for third-party liability coverage) further demonstrates that "direct physical loss" does not mean "loss of use of tangible property." Rather, Section I covers "loss of use" only if caused by a physical loss to covered real or personal property.

4

(emphasis added). Where there is an "actual release of asbestos fibers from asbestos-containing materials," some courts have concluded that can be a "direct physical loss." *Id.* at 235-36; *see also Sentinel Mgmt.*, 563 N.W.2d at 297 (insured presented evidence that asbestos fibers were "released . . . by abrasions from normal residential and building maintenance activities"). The same courts, however, have found *no* "direct physical loss" where asbestos-containing materials remain intact. *Port Authority*, 311 F.3d at 236; *see also Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F. Supp. 259, 263 (D. Or. 1990), *aff'd*, 953 F.2d 1387 (9th Cir. 1992) (no coverage for removal of insulation containing asbestos that remained intact). Here, as Ward's own expert explains, the Chinese drywall "remains fully intact" and "is not crumbling [or] deteriorating" (Doc. 31-1, ¶ 5). The problem with Chinese drywall is that it emits sulfuric gases; it does not involve any physical loss to the drywall.[2] (*Id.*, ¶¶ 9-10.)

Indeed, as Ward's own case law explains, "[i]n ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration of its structure." *Port Authority*, 311 F.3d at 235 (quoting 10 Couch on Insurance § 148:46 (3d ed. 1998)). The undisputed facts demonstrate there has been no such alteration to Ward's drywall. Rather, this case is analogous to those in which a new home contained unanticipated construction defects, *Whitaker v. Nationwide Mut. Fire Ins. Co.*, 115 F. Supp. 2d 612, 616-17 (E.D. Va. 1999) (Jackson, J.), or where part of a wall sustained covered damage, but the remainder was undamaged (although improperly grouted), *Tocci Bldg. Corp. v. Zurich Am. Ins. Co.*, 659 F. Supp. 2d 251, 259 (D. Mass. 2009); *see also Pirie v. Federal Ins. Co.*, 696 N.E.2d

---

[2] Ward also cites a 40-year-old case from Colorado involving the accumulation of a large quantity of gasoline in the ground directly under and around a building, apparently coming from a nearby gas station, directly impacting the foundation and contaminating the building. *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 53-55 (Colo. 1968). Those facts are not comparable to the invisible chemical reaction that occurs with Chinese drywall, causing no loss whatsoever to the drywall itself but releasing a gas that can damage other building components.

553, 555 (Mass. App. Ct. 1998) (presence of lead paint that was intact but required abatement was not a "physical loss").

There is also no merit to Ward's argument that he is entitled to the cost of replacing undamaged drywall because removal of drywall is necessary to repair wiring or plumbing, or to protect against future damage to those building components.  (Doc. 31, at 10-11.)  Any claimed damage to the wiring and pipes is excluded by four different exclusions, and thus TravCo bears no responsibility for repairs thereto.

### 2.    All Four Exclusions Apply

As Ward recognizes, "[t]o avoid coverage, TravCo must establish that **one** of its policy exclusions apply," not all of them.   (Doc. 31, at 11 (capitalization and bold face omitted; emphasis added).  But all four are unambiguously applicable to Ward's claimed losses.

### a.    Latent Defect Exclusion

Ward incorrectly suggests that the latent defect exclusion applies only to "expected losses."  (Doc. 31, at 12.)  The opposite is true.  As the Virginia Supreme Court and Fourth Circuit have explained, a "latent defect" is "hidden from knowledge as well as from sight," *Glens Falls Insurance Company v. Long*, 77 S.E.2d 457, 460 (Va. 1953), and "not readily discoverable and integral to the damaged property by reason of *its* design or manufacture or construction."  *U.S. West v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415 (table), 1997 WL 400081, at *5 (4th Cir. July 16, 1997) (unpub.).  Defects in drywall causing the emission of invisible, corrosive gases fall precisely within these definitions.

Hoping to avoid the Policy's plain language and the foregoing case law, Ward relies heavily on a decision rendered by a Louisiana state trial court, drafted by the plaintiffs' attorneys

in that case,[3] that is irrelevant to application of Virginia law and is simply wrong on this point and others.  *See Finger v. Audobon Ins. Co.*, 2010 WL 1222273 (La. Civ. Dist. Ct. Mar. 22, 2010).  Another Louisiana trial court has disagreed with *Finger*, denying an insured's motion for summary judgment and granting the insurer's motion in a Chinese drywall case involving the same issues presented here.  *Ross v. C. Adams Construction & Design, L.L.C.*, No. 676-185 (La. 24th. Jud. Dist. Ct. Apr. 14, 2010) (Exhibit A hereto; motion papers at Exhibit B).[4]

Ward also focuses on the fact that the Policy excludes loss caused by "Latent defect, inherent vice, *or any quality in property that causes it to damage or destroy itself*."  (Doc. 17-2, at 45 (emphasis added).)  He claims that, based on the context, a "latent defect" must be a "quality in property that causes it to damage or destroy itself" (Doc. 31, at 13).  But a plain reading of that clause demonstrates that "latent defect" must have a *different* meaning from a "quality in property that causes it to damage or destroy itself."  Ward's interpretation would render the term "latent defect" meaningless, violating the fundamental principle that "[n]o word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."  *Heron v. Transp. Cas. Ins. Co.*, 650 S.E.2d 699, 702 (Va. 2007); *see also Admiral Ins. Co. v. Ace American Ins. Co.*, 2009 WL 783321, at *5 (W.D. Va. Mar. 24, 2009) (Wilson, J.) (agreeing with other courts that have refused "to interpret the scope of . . . two exclusions as identical" because that "would render policy language redundant").

---

[3] The New Orleans state trial court in *Finger* initially denied the insureds' motion for summary judgment.  The insureds then filed a motion to strike the insurer's affirmative defenses, making arguments virtually identical to those in the summary judgment motion.  The state court then orally granted the motion to strike and invited the insureds' attorney to provide him with a draft decision, which he signed without making any modifications.
[4] The Fire, Casualty & Surety (FC&S) bulletin cited by Ward is not admissible evidence and is irrelevant because there is no ambiguity in the term "latent defect." *See Schneider v. Continental Cas. Co.*, 989 F.2d 728, 732 (4th Cir. 1993).  In any event, the FC&S bulletin relates to a "Processors Coverage Form" not at issue here, and it also states that the exclusion applies to losses "due to a hidden or latent defect," which would apply here.  (Doc. 31-8, at 4.)  Moreover, a second FC&S bulletin Ward submits specifically concludes that the latent defect exclusion applies to Chinese drywall claims.  (Doc. 31-12, at 4.)

*Ariston Airline & Catering Supply Co. v. Forbes*, 511 A.2d 1278 (N.J. Super. Ct. Law Div. 1986), a New Jersey trial court opinion heavily relied on by Ward, involved distinctly different policy language, excluding loss caused by "wear and tear, deterioration . . . [and] inherent or latent defect" as part of the same provision.  *Id.* at 1281.  Based on that, the court construed "inherent or latent defect" as "restricted to mean losses occasioned by such things as 'deterioration' and 'wear and tear,'" and not by design or construction defects.  *Id.* at 1283.  The court noted that another insurer's policy in that case specifically excluded design and construction defects.  *Id.  Ariston Airline* is plainly inapposite here – in Ward's Policy the exclusions for wear and tear and deterioration are in a separate clause from the latent defect exclusion, and the Ward Policy also excludes loss caused by faulty materials.  (Doc. 17-2, at 26.)

There is likewise no merit to Ward's contention that, because courts have concluded that the economic loss rule is inapplicable in products liability cases involving Chinese drywall brought against manufacturers and builders, the "latent defect" exclusion is therefore inapplicable here.  (Doc. 31, at 15.)  Under the economic loss rule, there is no cause of action in tort "when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss."  *In re Chinese Drywall Prods. Liab. Litig.*, 2010 WL 277063, at *7 (E.D. La. Jan. 13, 2010) (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 859 (1986)).  The cases cited by Ward found this rule inapplicable to products liability claims involving Chinese drywall because the drywall does not injure itself, and does not cause purely economic loss.  As the court explained, "[t]he Chinese drywall is not structurally inferior drywall, nor does it fail to serve its intended structural purpose; rather, *its **defects** go beyond disappointed economic expectations*, causing harm which justifies access to tort remedies."  *Id.* at *12 (emphasis added); *see also In re All Pending Chinese Drywall Cases*, Civil Docket Nos. CL09-3105 et al., slip op. at 5-10 (Va. Cir. Ct. Mar.

29, 2009) (Doc. 31-4) (reaching similar conclusion).  These courts did not conclude that Chinese drywall is not defective—such a holding would have been fatal to the plaintiffs' products liability claims.  To the contrary, both Judge Fallon and Judge Hall describe their cases as involving "defective Chinese drywall" and repeatedly use the term "defective" or "defect" in describing the drywall.  *Chinese Drywall Prods. Liab. Litig.*, 2010 WL 277063, at *1, 9, 12; *In re All Pending Chinese Drywall Cases*, slip op. at 2.  Their decisions are based on the latent nature of the defect—Judge Hall describes the drywall as alleged to be "inherently defective," *id.*—not on a conclusion that there is no defect.

Moreover, both Judge Fallon and Judge Hall relied on asbestos cases holding that the economic loss rule was inapplicable because building materials made of asbestos, like Chinese drywall, continue to hold up structurally despite release of contaminants.  *Chinese Drywall Prods. Liab. Litig.*, 2010 WL 277063, at *15-17; *In re All Pending Chinese Drywall Cases*, slip op. at 9-10.  Ward, however, ignores an appellate decision cited by TravCo holding that "because the presence of asbestos material in the school buildings is not detectable by the naked eye and is not apparent to any but the most searching analysis, it is a latent defect subject to the latent defect exclusion."  *Board of Educ. v. Int'l Ins. Co.*, 684 N.E.2d 978, 983 (Ill. App. 1997).

Ward also fails to explain his own sworn interrogatory answers in state court, which repeatedly state that his home contains "defective drywall" (Doc. 17-10, at 7-10), or his allegation in state court that the drywall contains a "***latent Defect***" (Doc. 17-9 (emphasis added)).  Without such an explanation, these evidentiary admissions are dispositive.  In any event, Ward's own use of the ordinary meaning of "latent defect" demonstrates that the exclusion applies.

**b.    Faulty Materials Exclusion**

In addressing the faulty materials exclusion, Ward simply repeats the same arguments he makes on the latent defect exclusion, claiming that the drywall is purportedly not defective.

(Doc. 31, at 22-23.)  Even if the drywall somehow does not contain a "latent defect," it certainly is "faulty, inadequate or defective" within the ordinary meaning of those words.  Ward himself has admitted, in his sworn answers to interrogatories, that his home "contains *defective* drywall imported from China" (Doc. 17-10, at 7-8 (emphasis added)), and that "I made a claim on my homeowner's insurance policy *for the damage caused by the **defective** Chinese drywall*" (*id.* at 9 (emphasis added)).

### c.       Corrosion Exclusion

Ward argues that the corrosion exclusion is inapplicable because "the loss . . . is not caused by corrosion (instead corrosion is the loss caused by the gases emitted by the drywall)" (Doc. 31, at 23).  But to the extent the gases were a cause, they are excluded by the pollution exclusion.  Furthermore, the term "corrosion," when used in the Policy to describe a cause of loss, refers to the process by which a metal component is gradually worn away and becomes damaged.  A Maryland federal court has persuasively rejected the same argument Ward makes:

> [P]laintiffs go further and argue that "corrosion" has two meanings - the process of corrosion and the product of corrosion - and that Exclusion 2.g. is intended to cover only the latter, i.e., the corrosion itself, not an effect of the process of corrosion such as the loss of required structural strength. There are three fallacies in this argument. First, plaintiffs have not presented one shred of evidence to suggest that the parties did not intend that the word "corrosion" as used in Exclusion 2.g. was not intended to encompass both aspects of its commonly understood meaning. Second, although there are two definitions given to "corrosion" in Webster's Third International Dictionary, and although the second definition is "a product of corrosion," the first definition itself includes both of the meanings ascribed by plaintiffs: "the action, process or effect of corroding." Third, when Exclusion 2.g. is read in its entirety, i.e. beginning at the start of the exclusions section on page 1 rather than with the alphabetical heading g., it seems apparent that as a matter of grammatical structure corrosion is being used in its sense of a process, not in its sense of a completed state. Beginning at the beginning, the Exclusion states: "we will not pay for loss, expense or damage . . . caused by or resulting from . . . corrosion." Thus read, that which is being excluded is precisely that which plaintiffs seek to include: losses and damages, such as the loss of required structural strength, that are the effects of corrosion.

*Kay v. United Pac. Ins. Co.*, 902 F. Supp. 656, 658 (D. Md. 1995).  Other courts have reached the same result.[5]

Although Ward repeatedly relies on Judge Fallon's opinions about other matters, he conveniently ignores Judge Fallon's adoption of the ASTM definition of "corrosion" as "the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties."  *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 2010 WL 1445684, at *6 (E.D. La. Apr. 8, 2010).  Ward's argument that the word "corrosion" refers to the deteriorated condition of the metal not the corrosion process itself is sophistry, and makes no difference in applying the Policy.  The deteriorated condition of the metal exists because the process of corrosion caused it.  The exclusion was plainly intended to apply to deterioration of metal.

Ward relies heavily on *Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co.*, 863 F. Supp. 1226 (D. Nev. 1994), but that case supports TravCo's position.  The court concludes that the term "corrosion" is unambiguous, and that "[c]orrosion means 'the action, process, or effect of corroding,'" and "[c]orrode means 'to eat away by degrees as if by gnawing . . . .'"  *Id.* at 1235.  It is irrelevant here that the court in *Pioneer* was unable to decide on summary judgment whether corrosion was the cause of the loss because the insertion of a rag into a piece of equipment may have been the cause.  *Id.* at 1232.  Here it makes no difference whether the loss was caused by a latent defect or other fault in the drywall, by the sulfuric gases, or by corrosion,

---

[5] *See, e.g.*, *Gilbane Bldg. Co. v. Altman Co.*, No. 04AP-664, 2005 Ohio App. LEXIS 981 (Ohio Ct. App. Mar. 8, 2005) (unpub.); *Heban v. Auto-Owners Ins. Co.*, No. WD-02-064, 2003 WL 21862170, at *17 (Ohio Ct. App. Aug. 8, 2003); *Transcontinental Ins. Co. v. Guico Machine Works, Inc.*, Civ. Nos. 06-2516 & 06-3184, 2008 U.S. Dist. LEXIS 69972, at *4-5 (E.D. La. Sept. 17, 2008); *Orthopedic Practice, LLC v. Hartford Cas. Ins. Co.*, Civ. No. 06-8710, 2008 U.S. Dist. LEXIS 18335, at *8 (E.D. La. March 10, 2008).

since all of those causes are excluded.  The other corrosion exclusion cases cited by Ward are either inapposite or do not even address a corrosion exclusion.[6]

### d.  Pollution Exclusion

Ward incorrectly argues that Virginia law limits the applicability of the pollution exclusion in his Policy to "traditional" environmental pollution.  Contrary to Ward's argument, the Virginia Supreme Court's only pertinent opinion, construing a pollution exclusion in a liability policy, readily found the exclusion unambiguously applicable to claims for miscarriages that were allegedly caused by pregnant women consuming toxic drinking water.  *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 628 S.E.2d 539, 541 (Va. 2006). The contaminant at issue was a byproduct of the process of disinfecting the water at a city water treatment facility.  *Id.*  This was by no means "traditional environmental pollution" by an industrial polluter that releases toxic substances into the air or dumps them in the ground.  The insured was the City of Chesapeake, and there was no suggestion that the city had any intention of poisoning its residents or even producing the contaminant at issue when it treated the water. Importantly, the Virginia Supreme Court declined to even *consider* out-of-state cases involving similar facts, concluding that "the law of this Commonwealth and the plain language of the insurance policy provide the answer . . . ."  *Id.* at 542.  One prominent out-of-state case very similar to *City of Chesapeake*—involving whether a pollution exclusion in a liability policy excluded coverage for a suit against a parish (county) arising from contamination of its water system—is *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 122 (La. 2000), which found the pollution exclusion *inapplicable*, and was relied on by the Louisiana trial court in *Finger*, 2010 WL

---

[6] *See Trus Joist Macmillan v. Neeb Kearney & Co.*, 2000 WL 306654, at *6-7 (E.D. La. Mar. 23, 2000) (concluding that merely because bedplates were rusted would not necessarily establish that rust was the cause of the damage); *SMI Realty Mgmt. Corp. v. Underwriter's at Lloyd's, London*, 179 S.W.3d 619 (Tex. App. 2005) (corrosion exclusion not at issue); *Reynolds v. Travelers Indem. Co.*, 233 S.W.3d 197 (Ky. App. 2007) (corrosion exclusion not at issue).

1222273, at ¶ 19.  Virginia's highest court, however, refused to even consider cases like *Doerr* in a case involving very similar facts.[7]

The Eastern District of Virginia has applied *City of Chesapeake* on two occasions, both times holding that pollution exclusions in liability policies were unambiguous.  The opinions held that heating oil was clearly a "pollutant" where a claim was made against a heating oil supplier, arising from an oil spill at a home due to a corroded oil line, *West Am. Ins. Co. v. Johns Bros., Inc.*, 435 F. Supp. 2d 511, 514-17 (E.D. Va. 2006) (Friedman, J.), and that a pollution exclusion applied where a contractor's application of a floor sealant caused fumes that allegedly caused personal injuries.  *Fireman's Ins. Co. v. Kline & Son Cement Repair, Inc.*, 474 F. Supp. 2d 779, 789-99 (E.D. Va. 2007) (Dohnal, Mag. J.).  The latter opinion squarely and persuasively rejected an argument that a pollution exclusion was limited to "traditional environmental pollution," and rejected out-of-state cases as inconsistent with Virginia law.  *Id.* at 791-97.

Ward also cites *Unisun Ins. Co. v. Schulwolf*, 2000 WL 33340659 (Va. Cir. Ct. Aug. 23, 2000), a state trial court letter-order, which does not reflect the current state of Virginia law because it was decided prior to *City of Chesapeake*, *Johns Brothers*, and *Kline & Son*.  With no guidance from the Virginia Supreme Court or any other courts applying Virginia law at that time, the *Schulwolf* court felt it had free reign to choose between competing lines of authority in other jurisdictions in deciding whether injuries to infants from lead paint fell within a pollution exclusion for liability coverage.  *Id.* at *4.  Subsequently, *Johns Brothers*, and *Kline & Son* properly held that similar pollution exclusions were unambiguous.[8]

---

[7] *Doerr* is also inapplicable to property insurance for numerous reasons, some of which are addressed briefly below.

[8]  The other Virginia cases cited by Ward are irrelevant here, they simply hold that uncontaminated floodwaters or runoff water are not "pollutants" as defined in a pollution exclusion.  *State Auto. Prop. & Cas. Ins. Co. v. Gorsuch*, 323 F. Supp. 2d 746, 755 (W.D. Va. 2004) (Jones, J.); *Nationwide Mut. Ins. Co. v. Boyd Corp.*, 2010 WL 331757, at *3-4 (E.D. Va. Jan. 25, 2010) (Hudson, J.).

All of these liability insurance cases are not directly applicable to property insurance. They are useful here only to the extent that they demonstrate that Virginia has not imposed judicially-created limitations on the pollution exclusion's text in liability policies where some other jurisdictions have done so.   Importantly, as Ward concedes, there is a fundamental difference between first-party property insurance (which is at issue here) and third-party liability insurance.  (Doc. 31, at 8 n.12; *id.* at 29 n.34.)  As a case Ward relies on explains, "[t]he primary aim of third-party insurance is to defend and indemnify insureds against liability for claims made against them as a result of their own conduct.  First-party coverage, on the other hand, protects against physical damage to the insured's own property by a covered cause of loss.  Wholly different interests are protected by the two distinct forms of coverage."  *Port Authority*, 311 F.3d at 233.   Thus, while some out-of-state liability insurance cases have focused on whether the insured is a "polluter" or creates "pollution," under property coverage it makes no difference who caused the harm.   Property policies cover direct physical loss to the insured's property regardless of whether the loss is caused by acts of God, negligence of third parties, and even negligence of the insured, if the cause is not excluded.   Courts have consistently enforced pollution exclusions in the context of first-party property insurance.[9]

Ward asks this Court to disregard Virginia law on liability insurance, and then make out-of-state law on liability insurance applicable to property insurance.   These arguments are misplaced for several reasons.  First, Ward's cases rely heavily on the history of pollution exclusions in liability policies, finding that they were adopted in the 1970s in response to new legislation requiring cleanup of industrial environmental pollution, and that their purpose was to

---

[9] *See, e.g.*, *Great Northern*, 793 F. Supp. at 263 (enforcing pollution exclusion and holding that costs to remove asbestos from insured building are expressly barred from coverage); *Brown v. Am. Motorists Ins. Co.*, 930 F. Supp. 207, 208-209 (E.D. Pa. 1996), *aff'd*, 111 F.3d 125 (3d Cir. 1997) (enforcing unambiguous pollution exclusion and holding that alleged damage to house from fumes from sealant that migrated into insured's house was excluded).

exclude coverage for such claims. *See Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 18 (N.Y. 2003); *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1210-11 (Cal. 2003); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 681 (Ky. 1996). Property policies, however, contained exclusions for loss caused by "contamination" long before the environmental movement that led to the pollution exclusion in liability policies, and the contamination exclusion was enforced in circumstances not involving traditional environmental pollution.[10]

Second, Ward's cases are premised on a rationale that pollution exclusions in liability policies could lead to unintended and absurd results because, if read broadly, they might exclude claims for injuries from a slip-and-fall on spilled Drano or from chlorine in a swimming pool. *Motorists Mut.*, 926 S.W.2d at 682; *MacKinnon*, 73 P.3d at 1214. In contrast, the pollution exclusion in the Ward Policy expressly *covers* damage to Ward's home caused by pollutants if "the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C," which includes 17 different perils. (Doc. 17-2, at 26-28.) In effect, the exclusion and the exception for named perils convert the Policy from providing open peril (sometimes called "all-risk") coverage to providing only "named peril" coverage for pollution-related losses. The exclusion is not overly broad and does not lead to absurd results.[11]

Third, Ward's cases hold that pollution exclusions in liability policies apply only to "a discharge into the environment," *West Am. Ins. Co. v. Tufco Flooring East, Inc.*, 409 S.E.2d 692, 699 (N.C. 1991), or "discharge or release into land, atmosphere, or water," *Belt Painting*, 795

---

[10] *See, e.g.*, *Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939, 940-41 (5th Cir. 1965) (quoting policy that excluded "loss caused by . . . contamination"); *Am. Cas. Co. of Reading, Penn. v. Myrick*, 304 F.2d 179, 181 (5th Cir. 1962) (property policy excluded "loss or damage caused by or resulting from . . . contamination" unless caused by explosion; applying contamination exclusion where pipe broke, releasing ammonia); *McQuade v. Nationwide Mut. Fire Ins. Co.*, 587 F. Supp. 67, 68 (D. Mass. 1984) (applying contamination exclusion to homeowner's property loss caused by chemicals sprayed by exterminator).

[11] Notably, the liability insurance section of the Ward Policy has no pollution exclusion applicable to claims against Ward for bodily injury or property damage. (Doc. 17-2, at 35-37.) The only pollution exclusion in that section is limited to claims for "personal injury" which is defined as certain specific torts. (Doc. 17-2, at 44, 48.) Thus, if someone slips on Drano in Ward's home and sues him, TravCo would cover that liability claim.

N.E.2d at 21.   Such an interpretation, if applied to property insurance, would eviscerate the pollution exclusion because property insurance covers only buildings and personal property, not the land or the atmosphere or personal injuries.   (*See* Doc. 17-2, at 20-21.)   Ward's argument that the pollution exclusion applies only to releases of pollutants outdoors is further refuted by the fact that the exception to the pollution exclusion in Ward's Policy specifically *covers* pollution losses where the pollutant is released due to causes that can only occur inside a building, such as an accidental discharge from a heating system.   (Doc. 17-2, at 26, 28.)   If the pollution exclusion were meant to apply only to outdoor activity, this exception would be meaningless.   *See Kline & Son*, 474 F. Supp. 2d at 790-91 (rejecting similar argument made by insured on similar grounds).

Finally, Ward's argument that Chinese drywall is not a "contaminant" or "irritant" is irrelevant because TravCo's position is that the *sulfuric gases*, not the drywall, are the "pollutants."   (*See* Doc. 17, at 23.)   Ward claims that these gases cause widespread corrosion of metal surfaces, produce an odor that permeates the residence, and cause skin rashes, lesions and nose bleeds.   (*See* p. 2, *supra*.)   Accepting that as true, these gases are plainly "irritants" and "contaminants" within any reasonable interpretation of those terms.   By analogy, even a case Ward relies on recognizes that "[w]e would be doing a disservice to the English language if we were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, are not an irritant."   *Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888, 892 (Minn. 1994).   The Chinese drywall opinion relied on by Ward further states that "the Chinese drywall is releasing contaminates [sic]," and repeatedly uses the words "contaminates" and "contaminating" in describing the claimed effects of the sulfuric gases on homes and persons' health.   *Chinese Manufactured Drywall Prods. Liab. Litig.*, 2010 WL 277063, at *17.

### 3.      The Ensuing Loss Clause Is Not Applicable

Ward's argument that the claimed damage to metal components is covered as an "ensuing loss" is without merit.  The Court need not even consider this argument unless it finds that the damage to the metal components is *not* excluded by *either* the pollution exclusion and/or the corrosion exclusion.  This is because the ensuing loss clauses provide coverage only for "any ensuing loss *which is not excluded* by any other provision in this policy" (Doc. 17-2, at 29-30 (emphasis added); *id.* at 27.)  Thus, if the pollution and/or corrosion exclusions apply, the ensuing loss clause is irrelevant.  *See*, *e.g.*, *Schloss v. Cincinnati Ins. Co.*, 54 F. Supp. 2d 1090 (M.D. Ala. 1999), *aff'd without opinion*, 211 F.3d 131 (11th Cir. 2000) (ensuing loss separately excluded is not covered).

Even if both the pollution and corrosion exclusions were found inapplicable, the damage to metal components still would not be an "ensuing loss," but rather the direct result of the drywall.  While Virginia courts have not construed an "ensuing loss" clause, leading decisions by other state supreme and appellate courts "have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk."  *Narob Dev. Corp. v. Ins. Co. of N. Am.*, 631 N.Y.S.2d 155, 155-56 (N.Y. App. Div. 1995).  These courts have found no "ensuing loss" if "there was no subsequent ensuing cause of loss *separate and independent* from the initial excluded cause of loss . . . ."  *Weeks v. Co-operative Ins. Cos.*, 817 A.2d 292, 296 (N.H. 2003) (emphasis added) (holding that there was no coverage for damage caused by separation of walls due to faulty workmanship).  This is because interpreting the ensuing loss exception as providing coverage for damage caused directly by the excluded cause of loss would "render[] the . . . exclusion meaningless, a result which we conclude is not reasonable."  *Id.* at 297.  Supreme or appellate courts in California, Indiana,

Nebraska, New York, New Hampshire, Minnesota, Massachusetts, North Carolina and Washington all agree on this point.[12]

Here, according to Ward's expert, the latent defect in the drywall that produces the sulfuric gases is what causes the claimed damage to metal surfaces.  (Doc. 31-1, ¶ 9.)  There is no separate and independent cause (such as if corrosion of electrical wires were to cause a fire, resulting in fire damage).   The direct and obvious result of installing drywall that, in ordinary Virginia climatic conditions, emits sulfuric gases, is that the gases will contaminate the home and damage metal surfaces.  No "new hazard or phenomenon" is to blame for this damage, *Acme*, 270 Cal. Rptr. at 411.[13]  The only physical loss at all is to the metals, and Ward's own expert attributes that loss directly to the gases emitted by the drywall.  (Doc. 31-1, ¶ 9.)  The latent defect and faulty materials exclusions would become meaningless if the damage to metals were considered an "ensuing loss" rather than a loss caused by defects in the drywall.

Even *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296 (Minn. App. 1997), cited by Ward, recognized that an ensuing loss must be a "distinct peril" that is "separable" from the excluded cause of loss.   *Id.* at 301.   The court's holding that asbestos contamination was somehow separable from the wear and tear that released the fibers is

---

[12] *Acme Galvanizing v. Fireman's Fund Ins. Co.*, 270 Cal. Rptr. 405, 411 (Cal. Ct. App. 1990); *Hartford Cas. Ins. Co. v. Evansville Vanderburgh Pub. Library*, 860 N.E.2d 636, 646 (Ind. App. 2007); *Gies v. City of Gering*, 695 N.W.2d 180, 193 (Neb. Ct. App. 2005); *Narob Dev. Corp.*, 631 N.Y.S.2d at 155-56; *Weeks*, 817 A.2d at 296; *Bloom v. W. Nat'l Mut. Ins. Co.*, No. A05-2093, 2006 Minn. App. Unpub. LEXIS 651, at *14 (Minn. App. July 3, 2006); *Hanover New England Ins. Co. v. Smith*, 621 N.E.2d 382, 383 (Mass. App. Ct. 1993); *Smith v. State Farm Fire & Cas. Co.*, 425 S.E.2d 719, 720-21 (N.C. Ct. App. 1993); *Alwart v. State Farm Fire & Cas. Co.*, 508 S.E.2d 531, 534 (N.C. Ct. App. 1998); *Wright v. Safeco Ins. Co.*, 109 P.3d 1, 7 (Wash. Ct. App. 2004).

[13] *See also Wright*, 109 P.3d at 7 (holding that ensuing loss clause was inapplicable to water and mold damage caused by construction defects because there was no "supervening cause that broke the causal connection between the construction defects and the mold damage"); *Schloss*, 54 F. Supp. 2d at 1096 (explaining that only a separate loss that occurs as a result of an excluded cause of loss can qualify as a covered ensuing loss, and concluding that repairs necessitated by rot caused by defective design and installation of home renovations were not ensuing losses).

unpersuasive, but also distinguishable from the case at bar, where the drywall remains in pristine condition and the only loss is to the metals.[14]

### C.    The Personal Property Losses Are Not Covered

The Policy covers personal property only for loss caused by one or more of the 17 perils specified in the Policy (*see* Doc. 17-2, at 27-28), and Ward does not claim that any of those perils caused his losses.  Ward bears the burden of establishing that his loss was caused by a named peril.  *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 157 (4th Cir. 2009).  TravCo is thus entitled to summary judgment on the personal property losses.

### D.    Ward's Evidentiary Issues And Rule 56(f) Affidavit Are Without Merit

In his zeal to create issues of fact, Ward even tries to dispute the authenticity and admissibility of his own expert's report, which he provided to TravCo (*see* Doc. 31 at 5 n.10). The authenticity and admissibility of that report, however, are easily established.[15]

Ward's Rule 56(f) affidavit fails to demonstrate a need for further discovery, or why he did not seek and could not have completed that discovery by now.  Contrary to Ward's argument,

---

[14] *Aetna Ins. Co. v. Getchell Steel Treating Co.*, 395 F.2d 12 (8th Cir. 1968), cited by Ward, involved a fire – a classic example of a separate and independent event constituting an ensuing loss.  *Bradley v. USAA*, No. CL04-1731, 2005 WL 4838384 (Va. Cir. Ct. July 5, 2005) involved whether an endorsement to an insurance policy complied with regulatory requirements.  In *Blaine Constr. Corp. v. Ins. Co. of Am.*, 171 F.3d 343, 350-51 (6th Cir. 1999), the court held that it was bound by a 1970 decision on point applying Tennessee law, and accordingly did not consider any of the more recent authority on ensuing loss from other jurisdictions.  In a more recent case involving Kentucky law, the Sixth Circuit reached a contrary result.  *Travelers Prop. Cas. Co. v. B&W Resources, Inc.*, 2006 U.S. Dist. LEXIS 78311, at *11 (E.D. Ky. Oct. 26, 2006), *aff'd*, 259 F.App'x 779 (6th Cir. Jan. 9, 2008).

[15] Although the Hejzlar Report is not necessary for resolution of this motion, Ward's Answer establishes the authenticity of that report by admitting the Complaint's allegation that "[a] true and correct copy of the Hejzlar Report as provided by Mr. Ward to TRAVCO is attached as Exhibit B hereto."  (Complaint, ¶ 13; Answer, ¶ 13.) The affidavit of Travelers' adjuster also establishes the authenticity of the Hejzlar Report as the document provided to him by Ward.  (Doc. 17-1, ¶  9.)  The report is not hearsay because it was submitted by Ward to TravCo to support his insurance claim (*id.*), and thus constitutes "a statement of which [Ward] has manifested an adoption or belief in its truth."  Fed. R. Evid. 801(d)(2); *see also Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, Civ. No. 04-754, 2006 U.S. Dist. LEXIS 77970, at *13-15 (D.N.J. Oct. 26, 2006) (holding that expert opinion submitted to support patent application was admissible against party submitting it); *Samaritan Health Center v. Simplicity Health Care Plan*, 459 F. Supp. 2d 786, 799 (E.D. Wisc. 2006) (expert report prepared for party was admissible against that party).  The report is also admissible as a statement of a party's agent under Fed. R. Evid. 801(d)(2)(D), and a statement of a person authorized by the party to make a statement concerning the subject, under Fed. R. Evid. 801(d)(2)(C).  *See, e.g.*, *United States v. Draiman*, 614 F. Supp. 307, 309 (N.D. Ill. 1985), *aff'd*, 784 F.2d 248 (7th Cir. 1986) (report of accountant retained by defendant was admissible against defendant).

in the absence of an ambiguity, discovery on "drafting history" of policy language is unnecessary. *Schneider*, 989 F.2d at 732 (under Virginia law, "[i]f the text of the [insurance] agreement is unambiguous, then the court is without authority to resort to extrinsic evidence in interpreting its meaning"). There is likewise no merit to Ward's request that this Court wait to see if the Consumer Products Safety Commission or other scientists will someday opine on unresolved scientific issues involving Chinese drywall.[16] There is no way of knowing if or when scientists will be able to conclusively answer those questions. Ward's own retained expert, Dr. Hejzlar, has been studying the science of Chinese drywall for over a year (Doc. 31-1, ¶ 3), and evaluated the Ward home eight months ago (Answer, ¶ 13, admitting Complaint, ¶ 13). This Court has an obligation to ensure the "speedy" resolution of civil suits, Fed. R. Civ. P. 1, and cannot wait indefinitely for scientific theories to develop (especially where the theories suggested would not affect coverage). Finally, to the extent Ward desires copies of TravCo's laboratory test results (he did not serve discovery or otherwise request the test results prior to filing position brief), TravCo will provide them. The results, which <u>confirm</u> Ward's position and Hejzlar's conclusion that defective Chinese Drywall is present in Ward's home, are not necessary to resolution of this motion. This motion thus can and should be resolved forthwith.

**TRAVCO INSURANCE COMPANY**

By: _____/s/_____
                    Counsel

---

[16] According to Ward, the unresolved scientific issues are whether "formic or acetic acid" and moisture may contribute to causing corrosion of metals. (Doc. 31-6, ¶ 10.) Even if these theories could be established, neither would impact coverage. The pollution exclusion specifically includes "acids" in the definition of "pollutants" (Doc. 17-2, at 26). Furthermore, Ward's argument regarding moisture ignores that normal, ordinary drywall when exposed to ordinary (or even extraordinary) humidity in the Virginia climate does not emit sulfuric gases that have a noxious odor and cause corrosion of building components. (*See* Doc. 31-2, at 1.)

John B. Mumford, Jr. (VSB No.: 38764)
Kathryn E. Kransdorf (VSB No.: 74124)
Hancock, Daniel, Johnson & Nagle, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
jmumford@hdjn.com
kkransdorf@hdjn.com
Phone: (804) 967-9604
Fax: (804) 967-2411

Stephen E. Goldman (*pro hac vice*)
Daniel F. Sullivan (*pro hac vice*)
Wystan M. Ackerman (*pro hac vice*)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
sgoldman@rc.com
dsullivan@rc.com
wackerman@rc.com
Phone: (860) 275-8200
Fax: (860) 275-8299
*Counsel for TravCo Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 26th day of April, 2010 I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

Richard J. Serpe
Law Offices of Richard J. Serpe, P.C.
580 East Main Street, Suite 310
Norfolk, Virginia 23510-2322
rserpe@serpefirm.com

/s/

John B. Mumford, Jr. (VSB No.: 38764)
Kathryn E. Kransdorf (VSB No.: 74124)
Hancock, Daniel, Johnson & Nagle, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
jmumford@hdjn.com
kkransdorf@hdjn.com
Phone: (804) 967-9604

Fax: (804) 967-2411
*Counsel for TravCo Insurance Company*